353 Conn. 433        SEPTEMBER, 2025        433

State v. Henderson

STATE OF CONNECTICUT *v.* CARLTON HENDERSON
(SC 20990)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder and risk of injury to a child in connection with the stabbing death of the victim, the defendant's former girlfriend, in the presence of the victim's twelve year old son, the defendant appealed to this court. Prior to the murder, the victim had been attempting to end her long-term relationship with the defendant allegedly because of the defendant's drug and alcohol abuse and his refusal or inability to contribute financially. She also had been attempting to force him to leave the home that they had been sharing. The defendant claimed that he was entitled to a new trial because the trial court improperly had denied his request for a jury instruction on the affirmative defense of extreme emotional disturbance. *Held*:

The trial court properly declined to instruct the jury on the affirmative defense of extreme emotional disturbance, as that court correctly concluded that a rational juror could not find by a preponderance of the evidence that the defendant was suffering from an extreme emotional disturbance at the time of the murder.

Although the evidence suggested that the defendant was exposed to an extremely unusual and overwhelming state that did not constitute mere annoyance or unhappiness, the evidence, even when viewed in the light most favorable to the defendant, did not demonstrate that the defendant lost self-control or that his ability to reason was overborne by extreme, intense feelings at the time of the murder, especially in view of his actions prior to the murder, his efforts to evade the police after the murder, and certain other conduct demonstrating consciousness of guilt and self-control.

(*One justice dissenting*)

Argued March 7—officially released September 23, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder and risk of injury to a child, brought to the Superior Court in the judicial district of New London and tried to the jury before *S. Murphy, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed*.

State v. Henderson

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Sarah E. Steere*, senior assistant state's attorney, and, on the brief, *Paul J. Narducci*, state's attorney, and *Christa L. Baker*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. Nearly thirty years ago, then Justice Robert J. Callahan anticipated the need for a particularized evidentiary showing of extreme emotional disturbance in intimate partner homicide cases in order not to establish "a per se rule that anyone who kills a former girlfriend or boyfriend is entitled to a jury instruction on extreme emotional disturbance." *State* v. *Person*, 236 Conn. 342, 361–62 and n.1, 673 A.2d 463 (1996) (*Callahan, J.*, dissenting). Justice Callahan's observation is instructive as we consider the appeal of the defendant, Carlton Henderson, who was convicted, after a jury trial, of the murder of his long-term girlfriend (victim)[1] in violation of General Statutes § 53a-54a and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant claims that the trial court's denial of the defendant's request to instruct the jury on the affirmative defense of extreme emotional disturbance under § 53a-54a (a) entitles him to a new trial. We disagree and affirm the judgment of conviction.

The jury reasonably could have found the following facts. In November, 2019, the defendant and the victim lived together in Stonington with the victim's twelve year old son, J. The victim worked as a bank manager and, throughout her ten year relationship with the

[1] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

State v. Henderson

defendant, acted as the sole financial provider for the family. The defendant's addictions to phencyclidine (PCP) and alcohol, and his failure to maintain employment, were major sources of tension in the relationship.

On November 22, 2019, the defendant abruptly left his job at a Walmart store in Waterford, which he had held for about two months, leading to an argument with the victim. The victim pleaded with the defendant to continue working, but he accused her of "ratting" him out and causing him to lose his job. The victim denied the accusation and replied that the defendant was "looking for an excuse to quit." The victim expressed her frustration with the defendant, telling him via text message: "I'm done busting my ass to keep a roof over our heads and bills paid while you do NOTHING to help. I'd rather be by myself. . . . I asked you to do [two] things, don't smoke [PCP] and keep working because I need the help. Your quitting is a slap in the face." The victim then ended their relationship and asked the defendant to move out of their apartment, but he refused to do so.

Shortly thereafter, while J traveled to Pennsylvania with his father's family for Thanksgiving, the victim left the apartment to stay with her mother, who lived nearby. The victim informed her mother that she no longer felt safe with the defendant in the home. On November 23, 2019, the victim and her mother called the Stonington Police Department seeking help removing the defendant from the home. The dispatcher informed them that the police could not force him to leave but that, if any further "problem" were to occur, they should call again. Without help from law enforcement, the victim and her mother decided to change the locks in the apartment while the defendant was out; that proved impossible, however, because the defendant either remained in the apartment or parked his vehicle in front of the victim's mother's house, waiting

State v. Henderson

for the victim to return from work. The defendant warned the victim that, if she did not come home, "things were going to be bad . . . ."

On November 25, 2019, the defendant texted a friend concerning the victim: "These bitches are nasty . . . . After [ten] plus years, thanks." The friend responded: "Yeah, bro. Keep your head up. Karma is a bitch. And it is definitely real. She will get what she did to you in the next chapter." The defendant replied: "Word, bro. Next chapter. You already know karma is a bitch." The friend texted: "There is no doubt about it. If she kept it real, it would have been a positive karma. But being that it must have been some bullshit she pulled. The same or worse of the bad will fall her way. You just do you and don't let it break you. Hold tight and hold strong." The defendant replied: "I'm holding on strong, but if anything was ever to happen to me, hold it down, my boy, for real." The friend responded: "If shit getting that thick, hold off until the weekend. You can come get me, and we can solve whatever problem you're having with whoever . . . ."

On Friday, November 29, 2019, the day after Thanksgiving, J returned from Pennsylvania. The victim informed her mother that she would return home with J and seek the landlord's help in removing the defendant from the apartment because she "didn't think that [the defendant] would do anything with [J] there." The victim and J returned to the apartment between 7 and 8 p.m. The defendant spent the night smoking PCP and drinking in the sunroom.

The next morning, Saturday, November 30, J woke up at around 8 a.m. and started to watch cartoons on his cell phone. The victim entered his bedroom and asked if he wanted to go to a McDonald's restaurant. J replied affirmatively, and the victim went to get her coat, which was in the hallway right outside of J's bed-

State v. Henderson

room door. While the victim was putting on her coat, J saw the defendant "[come] up from behind her," "[grab] her by the neck," and put "her in . . . a choke hold." Frozen in fear on his bed, J watched as the victim tried to calm the defendant, asking him to "talk this out," and telling him that "[he didn't] have to do this." The struggle then moved from the hallway into J's bedroom. J tried to call for help on his phone, but the defendant took the phone from him. At that point, it appeared to J that the victim had calmed the defendant, as he released her "for a minute or two" and was "listening to what she ha[d] to say." The struggle resumed, however, and the defendant again placed the victim in a choke hold. The defendant pulled out a knife from his pocket and stabbed the victim in the neck; J saw blood dripping to the floor. The defendant released the victim, who then stumbled into the hallway and toward the front door. J followed and saw the defendant grab the victim by her hair, pull her back inside to prevent her from escaping through the front door, and tell her, "it's over, it's over," as the victim continued pleading with him to talk instead. J broke past them, running to a nearby house where he asked a neighbor to call the police.

At approximately 8:14 a.m., police officers were dispatched to the victim's home. As the officers arrived on the scene, another neighbor saw the defendant rush out of the back door of the home, enter his Nissan Maxima, and speed down the driveway, even though a police cruiser partially blocked the exit. The defendant drove directly toward a police officer, who was forced to jump out of the driveway to avoid being struck. The defendant maneuvered the vehicle through the gap between the parked cruiser and a fence, ignored police commands to stop, and sped away from the scene.

The victim, meanwhile, was lying on the front steps of the home, her face covered in blood and her head

State v. Henderson

resting on the lower step. Paramedics transported the victim to Westerly Hospital, and she was subsequently airlifted to Yale New Haven Hospital, where she was declared "brain dead." Life support measures were discontinued on December 6, 2019.[2]

After fleeing the crime scene, the defendant drove to a Dunkin' Donuts in North Stonington, where he was a regular customer. The defendant discarded J's phone on his route from the scene to Dunkin' Donuts; although it later "pinged" in North Stonington, it was never recovered. At around 8:40 a.m., the defendant placed a phone call to his mother, Cynthia Ellis, who gave him the phone number of a sister who lived in Brooklyn, New York. He called his other sister at 9:18 a.m. At 9:44 a.m., the defendant's daughter texted him to ask him to pick her up a coffee, to which he replied: "Yes, ten minutes."

The police obtained a search warrant for the defendant's cell phone location data. On the basis of this data, detectives learned that, on the morning of the stabbing, the defendant traveled from the crime scene to North Stonington, then to New London, and, ultimately, to New York City, where license plate readers recorded his Nissan Maxima crossing the Throgs Neck Bridge into Queens around noon, and then again in the opposite direction at around 3:30 p.m. Detectives later determined that the defendant went to see his sister, with whom he did not have a close relationship, to convince her to "hold" his car for him so that he could sell it. The cell phone location data last showed the defendant at an Interstate 95 truck stop in Fairfield County at approximately 5 p.m. on November 30, 2019,

---

[2] An autopsy performed the following day determined that the victim's cause of death was complications from sharp force injuries to the neck. The victim had four stab wounds in the back of her neck. One stab wound cut through her spinal cord, which paralyzed the victim and deprived her of the ability to breathe on her own.

State v. Henderson

when detectives believed the defendant switched the phone off.

That evening, the defendant also called his uncle, Willis T. Boykin, Jr. From Boykin, he learned that the victim was "fighting for her life" and that the police had surrounded the hotel where Boykin was living, looking for the defendant. The defendant spent a few days in Hartford, before reaching out, on December 4, 2019, to a high school friend, Ryann Pridham, who lived in Norwich. He asked her "what the word on the street was" about him. Pridham informed him that she had read in a newspaper that the victim was alive. Pridham testified that the defendant's demeanor was calm but sad and that they avoided discussing the victim. The defendant stayed the night at Pridham's apartment. The next morning, Pridham gave the defendant money for gas and food, and they both left the apartment and went their separate ways.

After the defendant left, Pridham contacted the police to inform them that the defendant had stayed at her apartment and that she expected him to return. Officers surveilled the apartment beginning on December 5, 2019, and apprehended the defendant after a short pursuit on foot. When he was arrested, the defendant still had traces of the victim's blood on his shoes, baseball hat, and cell phone.

The state charged the defendant with murder and risk of injury to a child. The defendant pleaded not guilty and elected a jury trial. In addition to the original charges, the court instructed the jury on the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), and on intoxication pursuant to General Statutes § 53a-7. The trial court, however, denied the defendant's request for a jury instruction on the affirmative defense of extreme emotional disturbance pursuant to § 53a-54a (a). The

State v. Henderson

jury returned a verdict of guilty of murder and risk of injury to a child, and the trial court rendered judgment in accordance with the jury's verdict. The trial court sentenced the defendant to a total effective term of seventy years of imprisonment. This direct appeal followed. See General Statutes § 51-199 (b) (3).

On appeal, the defendant claims that the trial court improperly denied his request for a jury instruction on the affirmative defense of extreme emotional disturbance. We disagree.

The following additional facts and procedural history are relevant to the defendant's claim. At trial, the defendant testified in his own defense and introduced the testimony of Boykin. Boykin testified about the defendant's longtime use of alcohol and PCP, which had been increasing in 2019. The defendant testified that he had used drugs throughout his adult life and that PCP was his drug of choice. He testified that his drug use and inability to keep a job frequently resulted in "trouble" between him and the victim. The defendant testified that he and the victim argued because he wanted to quit his job at Walmart. He stated: "I didn't want to be there. I felt broken . . . . I just didn't have the things that I wanted. I wanted to get high. I wanted to run around and hang out." The defendant further suspected that the victim was "trying to be with somebody else," although he admitted he had no proof. When the victim left their home to stay with her mother, he was "scared of losing her" and J, and tried to persuade her to return.

The defendant testified that, on the evening of November 29, 2019, the victim and J returned home. The defendant spent the night drinking and smoking PCP, and he did not recall going to sleep. The next morning, he asked the victim if she would drive him to a McDonald's restaurant. She told him to drive himself. He then saw her put her jacket on and thought that she

State v. Henderson

might have changed her mind. The defendant began preparing to join her when he saw her walking toward him with a knife in her hand, saying, "today you're going to get the . . . F out of here. One way or another you're getting out of here." The defendant claimed that he lunged for the knife, precipitating a struggle that spilled into J's bedroom. After that, "it was like a blur," and he remembered "nothing . . . but leaving."

The defendant testified that, when he saw the victim with a knife, he was "shocked" and "surprised," and felt "angry." When J was present, the defendant and the victim, by agreement, "never argued." Neither the defendant nor the victim had ever used a weapon against the other, and he testified that he "never [thought] she would do anything like that." Although the defendant testified that he "blanked out" and had no memory of stabbing the victim, he did remember grabbing his bag, leaving through the back door, and getting into his car. He did not recall nearly striking a police officer in the driveway or squeezing by the police cruiser near the fence, but testified: "When I remember leaving, I seen [the officer] on the way, and I left."

The defendant testified that he recalled stopping at Dunkin' Donuts because he needed "somewhere to think." He remembered calling Ellis and informing her that he and the victim had been arguing and that a knife was involved. When Ellis asked if the victim was all right, the defendant said: "I think so. I think she's straight." Ellis urged the defendant to turn himself in to the police, but he replied that he could not because he had no money. He recalled obtaining his sister's phone number and asking her to "hold" onto his car so he could "eventually sell it." The defendant contacted three or four other family members, including Boykin, "[t]o find out what was going on." When Boykin told him that the victim was "fighting for her life" and that the police were looking for him, the defendant

State v. Henderson

responded, "don't tell me that," and hung up. The defendant testified that he was "really scared" and "just . . . hoping that [the victim] was okay." For several days, he drove around "aimlessly," eventually driving to New York City and then returning to Hartford that same day. When the police finally caught up with him outside of Pridham's apartment in Norwich, the defendant attempted to flee because he knew that he was wanted for stabbing the victim.

The defendant filed a written request to charge the jury on the affirmative defense of extreme emotional disturbance. After hearing arguments from the parties, the trial court denied the request, concluding that there was "no evidence, including circumstantial, that would be sufficient to demonstrate that the defendant was under the influence of an extreme emotional disturbance and not something other than mere annoyance or unhappiness with the situation." Defense counsel took exception to the court's denial of his request.

Section 53a-54a (a), in defining the crime of murder, provides an affirmative defense for "a homicide committed by a defendant who acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . . Under such circumstances, if a defendant intentionally causes the death of an individual, but does so under extreme emotional disturbance, the trier of fact may convict the defendant of manslaughter in the first degree in violation of . . . § 53a-55 (a) (2)." (Internal quotation marks omitted.) *State* v. *Person*, supra, 236 Conn. 345. The defendant must establish two elements to prove the affirmative defense of extreme emotional disturbance, namely, that (1) he "committed the offense under the influence of extreme emotional disturbance,"

353 Conn. 433 SEPTEMBER, 2025 443

State v. Henderson

and (2) "there was a reasonable explanation or excuse for [his] extreme emotional disturbance." *State* v. *Forrest*, 216 Conn. 139, 148, 578 A.2d 1066 (1990); see also *State* v. *Person*, supra, 351.

The first element of the defense is subjective; it requires inquiry into the defendant's unique situation and belief to determine whether he did, in fact, experience an extreme emotional disturbance to ensure "that the claimed explanation as to the cause of his action is not contrived or sham."[3] *People* v. *Casassa*, 49 N.Y.2d 668, 678–79, 404 N.E.2d 1310, 427 N.Y.S.2d 769, cert. denied, 449 U.S. 842, 101 S. Ct. 122, 66 L. Ed. 2d 50 (1980). Applying the subjective element requires "an understanding of the situation as it would have been perceived, not by a perfectly sensible individual but by the particular defendant at bar . . . ." (Citation omitted.) *People* v. *Liebman*, 179 App. Div. 2d 245, 255–56, 583 N.Y.S.2d 234 (1992), appeal dismissed, 81 N.Y.2d 834, 611 N.E.2d 296, 595 N.Y.S.2d 395 (1993).

The second element of the defense, however, is primarily objective;[4] the fact finder evaluates the reason-

---

[3] "Because . . . § 53a-54a (a) is almost a literal copy of New York Penal Law §125.25 (1) (a), we find it appropriate to resort to the decisions of New York courts construing the common statutory language." *State* v. *Ortiz*, 217 Conn. 648, 654–55 n.6, 588 A.2d 127 (1991); see *State* v. *Elliott*, 177 Conn. 1, 5, 411 A.2d 3 (1979) ("[t]he fact that a statute is almost a literal copy of a statute of a sister state is persuasive evidence of a practical reenactment of the statute of the sister state; as such it is proper to resort to the decisions of a sister court construing that statutory language").

[4] A leading New York case on this point has explained: "Clearly the test of the reasonableness of the cause cannot be completely objective, for the model on which we fashion many of our legal standards, the reasonable man, quite plainly does not kill. . . . The subjective aspect of the test is therefore injected to offer room for argument as to the reasonableness of the explanations or excuses offered. . . .

"The question in the end will be whether the actor's loss of self-control can be understood in terms that arouse sympathy enough to call for mitigation in the sentence." (Citations omitted; internal quotation marks omitted.) *People* v. *Shelton*, 88 Misc. 2d 136, 143, 385 N.Y.S.2d 708 (1976), aff'd, 78 App. Div. 2d 821, 434 N.Y.S.2d 649 (1980); see also *State* v. *Elliott*, 177 Conn. 1, 9, 411 A.2d 3 (1979) (deeming *Shelton* to be persuasive and "exhaustive" examination of affirmative defense of extreme emotional disturbance).

State v. Henderson

ableness of the explanation or excuse for the defendant's extreme emotional disturbance from the perspective of a reasonable person in the defendant's situation, under the circumstances as the defendant believed them to be. *State* v. *Ortiz*, 217 Conn. 648, 657, 588 A.2d 127 (1991); see also *State* v. *Elliott*, 177 Conn. 1, 7, 411 A.2d 3 (1979) (explaining that § 53-54a (a) "sets forth a standard that is objective in its overview, but subjective as to the defendant's belief").

Whether the defendant was entitled to an instruction on the affirmative defense of extreme emotional disturbance is a question of law subject to plenary review, as is the case with other affirmative defenses for which the defendant bears the burden of proof. See, e.g., *State* v. *Person*, supra, 236 Conn. 352 (concluding, with respect to extreme emotional disturbance defense, that, "[i]f there is sufficient evidence of a legal defense, the defendant is entitled, as a matter of law, to a requested jury charge on that defense"). In reviewing a trial court's rejection of a defendant's request for a jury instruction on an affirmative defense, we "adopt the version of the facts most favorable to the defendant [that] the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Hargett*, 343 Conn. 604, 620, 275 A.3d 601 (2022). "[A] defendant is entitled to a requested instruction on the affirmative defense of extreme emotional disturbance only if there is sufficient evidence for a rational juror to find that [the defendant has established both] elements of the defense . . . by a preponderance of the evidence."[5] *State* v. *Person*, supra, 353.

[5] Quoting *United States* v. *Alfonso-Perez*, 535 F.2d 1362, 1365 (2d Cir. 1976), the defendant claims that he "is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . ." (Internal quotation marks omitted.) This claim conflates the "any evidence" standard with the sufficiency standard, which is a heavier burden. Indeed, in *State* v. *Person*, supra, 236 Conn. 342, this court overruled *State* v. *Belle*, 215 Conn. 257, 576 A.2d 139 (1990), and *State* v. *Bryan*, 34 Conn. App. 317, 641 A.2d 443 (1994),

State v. Henderson

The parties' arguments center on the subjective element of the extreme emotional disturbance defense.[6] The subjective element of the defense requires the fact finder to determine whether the defendant was under the influence of an extreme emotional disturbance when he committed the offense. Id., 351. In *State* v. *Elliott*, supra, 177 Conn. 1, this court identified three "understandable guidelines . . . essential to support the inference that a defendant suffered from extreme emotional disturbance at a particular time." (Citation omitted; internal quotation marks omitted.) *State* v. *Forrest*, supra, 216 Conn. 148. "[First] the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the Penal Code; [second] the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and [third] the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions." *State* v. *Elliott*, supra, 177 Conn. 9. These guidelines, however, "are neither conclusive nor exclusive," and they do not replace the two elements established by the legislature. *State* v. *Forrest*, supra, 148. "Consideration is given to whether the intensity of [the defendant's] feelings was such that his usual intellectual controls failed and [his] normal rational thinking . . . no longer prevailed at the time of the act. . . . [T]he term 'extreme' refers to the greatest degree of intensity

to the extent that they held that the presence of " 'any evidence' " is sufficient to entitle a defendant to a requested instruction regarding an affirmative defense. *State* v. *Person*, supra, 352–53.

[6] Neither party's brief addresses the objective element of the extreme emotional disturbance defense, which evaluates the reasonableness of the defendant's reaction. This is consistent with the trial court's oral decision denying the requested instruction on the ground that the defendant had failed to show that he experienced an extreme emotional disturbance.

State v. Henderson

away from the norm for [the defendant].'' *State* v. *Elliott*, supra, 10. An extreme emotional disturbance "does not require a provoking or triggering event; or that the homicidal act occur immediately after the cause or causes of the defendant's extreme emotional disturbance; or that the defendant have lost all ability to reason.'' Id., 7.

It is undisputed that the defendant satisfies the first *Elliott* guideline, as there is no evidence that he was suffering from a mental disease or defect rising to the level of insanity. See id., 9. There is, however, disagreement as to whether the other two guidelines were met, namely, whether there was sufficient evidence that "the defendant was exposed to an extremely unusual and overwhelming state" and that he experienced an extreme reaction to that state. Id. Reviewing the evidence in the light most favorable to the defendant, there is some evidence to find that, from the defendant's unique point of view, he was exposed to such a state. His claim fails, however, because the evidence overwhelmingly shows that he did not experience the requisite loss of self-control. A rational juror, therefore, could not have found by a preponderance of the evidence that the defendant experienced an extreme emotional disturbance. Accordingly, the trial court properly declined to instruct the jury on the affirmative defense of extreme emotional disturbance.

We begin our analysis with the second *Elliott* guideline, which requires the defendant to show by a preponderance of the evidence that he "was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness . . . ." Id. Viewed in the light most favorable to the defendant, the evidence shows that the victim was attempting to end their ten year relationship because of the defendant's alcohol and drug abuse, and his refusal to contribute financially to the household, and that the defendant faced the immi-

nent loss of his home, family, and financial security.
From the perspective of the defendant, who struggled
with addiction to both alcohol and PCP, did not want
to work, and appeared accustomed to having the victim
provide for his basic needs and enable his alcohol and
drug use, the prospect of having this relationship end
may arguably be understood to present a stressor beyond
the mere annoyance or unhappiness that would be expe-
rienced in an ordinary romantic breakup. Moreover, we
assume the veracity of the defendant's version of the
facts in accordance with the standard of review; see,
e.g., *State* v. *Hargett*, supra, 343 Conn. 620; which indi-
cates that the victim approached the defendant with a
knife to force him out of the apartment.[7] In light of the
defendant's testimony that the defendant and the victim
never argued when J was present, the introduction of
a weapon into the situation by the victim could have
elevated the situation to " 'extreme,' " in that it repre-
sented "the greatest degree of intensity away from the
norm" for the defendant. *State* v. *Elliott*, supra, 177
Conn. 10. Although the end of a romantic relationship,
and being asked to move out, is undoubtedly an upset-
ting event, it is also a common life experience; the
victim's introduction of a knife, however, elevates this
particular scenario to one that could allow a rational
juror to find by a preponderance of the evidence that
the defendant was exposed to an "extremely unusual
and overwhelming state . . . ." Id., 9.

Next, we turn to the defendant's reaction to the per-
ceived stressor, and we again review the evidence in
the light most favorable to the defendant. See, e.g., *State*
v. *Hargett*, supra, 343 Conn. 620. The defendant testified
that he was "shocked" and "surprised," and felt "angry"

_____

[7] Although we assume the veracity of the defendant's version of the facts
for purposes of this claim, we note that the defendant did not raise a self-
defense claim at trial and that the jury likely credited J's testimony, which
directly contradicts the defendant's account of the events.

State v. Henderson

when the victim threatened him with the knife and that he "went into a blur" and "blanked out" after he disarmed the victim and the struggle moved into J's bedroom. He argues that "mental distress, grief, and fear caused by the imminent loss of a decade-long intimate relationship overbore [his] self-control to the point where he engaged in a violent struggle with [the victim], whom he loved, in front of [J], whom the couple had previously been careful not to even argue in front of . . . ." He further contends that, when he engaged in everyday activities after the murder, like going to Dunkin' Donuts, he was "repressing what had happened . . . while in denial" and that his calls to family members demonstrate that he genuinely did not know what he had done to the victim and that he was concerned for her and J's well-being. We disagree that these facts would allow a rational juror to find by a preponderance of the evidence that the defendant lost self-control or that his ability to reason was overborne by extreme, intense feelings. See, e.g., *State* v. *Elliott*, supra, 177 Conn. 9.

"In determining whether a [defendant] has acted out of a loss of [self-control], the court will look at [his] conduct before and after the homicide." *Zamora* v. *Phillips*, Docket No. 04-CV-4093 (JFB), 2006 WL 2265079, *6 (E.D.N.Y. August 8, 2006); see, e.g., *People* v. *Dominguez*, 226 App. Div. 2d 391, 391, 640 N.Y.S.2d 583, appeal denied, 89 N.Y.2d 921, 677 N.E.2d 295, 654 N.Y.S.2d 723 (1996); *People* v. *Feris*, 144 App. Div. 2d 691, 692, 535 N.Y.S.2d 17 (1988). The petitioner in *Zamora*, who had shot and killed his former girlfriend, testified that, when he saw her kissing her new boyfriend, "his emotional system . . . fell down," and "he felt cold from head to toes," and that he shot the victim while in "a dreamlike state," without control over his actions. (Internal quotation marks omitted.) *Zamora* v. *Phillips*, supra, *1. After shooting the victim, the

State v. Henderson

petitioner threw the gun away and drove to a friend's house in another state. Id. Similarly, in *Feris*, the defendant was able "to skillfully drive his car backward and to negotiate a U-turn while in reverse in an effort to flee the [crime] scene . . . ." *People* v. *Feris*, supra, 692. In *Dominguez*, the defendant left the crime scene, consciously decided not to return home, disposed of the murder weapon, and fled the state. *People* v. *Dominguez*, supra, 391. In each of these cases, the court held that such postcrime actions are inconsistent with the loss of self-control associated with an extreme emotional disturbance because each respective defendant acted consciously and deliberately to evade the police. See, e.g., *Zamora* v. *Phillips*, supra, *7.

In the present case, the defendant took J's phone to prevent him from calling for help during the attack and later discarded it on his way to Dunkin' Donuts. Immediately after the stabbing, with the police on the way, the defendant packed a bag and left the victim's home through the back door. He then maneuvered his vehicle out of the driveway, through a narrow gap between a police cruiser and a fence. He unsuccessfully tried to convince his sister to "hold" onto his vehicle for him. The defendant drove to New York City and Hartford instead of returning home. He knew that the police had contacted his family members, so he sought out a friend, Pridham, for shelter and money. When the police confronted the defendant outside of Pridham's apartment, he ran. All of these actions demonstrate "consciousness of guilt, [which] is entirely inconsistent with an extreme emotional disturbance defense . . . ." (Internal quotation marks omitted.) *State* v. *Jusino*, 163 Conn. App. 618, 634, 137 A.3d 65, cert. denied, 321 Conn. 906, 136 A.3d 643 (2016); see also *Shiwlochan* v. *Portuondo*, 345 F. Supp. 2d 242, 269 (E.D.N.Y. 2004) (petitioner's efforts to hide murder weapon and to evade police were "products of a conscious decision

State v. Henderson

and undermine[d] the [petitioner's] claim that he was acting under the influence of an extreme emotional disturbance''), aff'd, 150 Fed. Appx. 58 (2d Cir. 2005); *State* v. *Patterson*, 229 Conn. 328, 333, 341, 641 A.2d 123 (1994) (evidence that defendant had intentionally concealed weapon prior to shooting and had fled city and hid weapon after shooting defeated claim that ''he had killed the victim in a fit of rage or passion, or under the influence of a similarly extreme emotion'').

The defendant argues, however, that such evidence is not dispositive because one need not ''los[e] all ability to reason'' to qualify for an extreme emotional disturbance defense. *State* v. *Elliott*, supra, 177 Conn. 7. He further contends that to deny him an instruction on the defense on the basis of postcrime conduct is inconsistent with *State* v. *O'Brien-Veader*, 318 Conn. 514, 122 A.3d 555 (2015), in which an extreme emotional disturbance defense instruction was given when a defendant hid the victim's body, gathered his belongings, cleaned himself up, hid bloody clothing and the murder weapon, and socialized with friends immediately after killing the victim. See id., 520–21, 522. We disagree. Most significant, *O'Brien-Veader* was a prosecutorial impropriety case that lacks any precedential value in this context because this court was not asked in that case to consider whether the evidence warranted an extreme emotional disturbance defense instruction. Second, postcrime conduct is only one of several considerations that a court weighs when determining whether to give an extreme emotional disturbance defense instruction. Because the jury instruction was not challenged on appeal in *O'Brien-Veader*, we cannot ascertain what significance the postcrime conduct had in relation to other factors the trial court may have considered.

Moreover, in the present case, the only evidence of the defendant's mental state at the time of the murder came from the defendant himself, who testified that he

State v. Henderson

was "shocked" and "surprised," and felt "angry" that the victim approached him with a knife and that he "blanked out" after disarming her.[8] In evaluating the sufficiency of the evidence for a jury charge, the weight to afford claims of blackout or other versions of memory loss that frequently accompany the assertion of an extreme emotional disturbance defense depends on the evidence of the defendant's mental state at the time the homicide was committed. See, e.g., *People* v. *Wells*, 101 App. Div. 3d 1250, 1252–53, 955 N.Y.S.2d 684 (2012), appeal denied, 20 N.Y.3d 1066, 985 N.E.2d 927, 962 N.Y.S.2d 617 (2013); see also *State* v. *Asherman*, 193 Conn. 695, 728, 732–33, 478 A.2d 227 (1984) (concluding that extreme emotional disturbance defense instruction was warranted on basis of testimony of witnesses regarding defendant's bizarre behavior and appearance after murder, as well as brutal nature of murder itself), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

We find the decision of the New York court in *People* v. *Wells*, supra, 101 App. Div. 3d 1250, instructive. In that case, the defendant "declined to testify regarding

[8] Although it is not required, defendants often present testimony of medical and mental health professionals to prove their mental state at the time of the murder. See, e.g., *State* v. *Crespo*, 246 Conn. 665, 678, 718 A.2d 925 (1998) (testimony of forensic psychiatrist and clinical psychologist that defendant was subject to long-term and immediate stress factors at time of murder), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999); *State* v. *Patterson*, supra, 229 Conn. 334–35 (testimony of three psychiatrists and clinical psychologist describing defendant's mental deterioration over two year period prior to murder); *State* v. *Blades*, 225 Conn. 609, 625–26, 626 A.2d 273 (1993) (testimony of primary care physician and psychiatrist regarding defendant's history of substance abuse and response to stressors); *State* v. *Casey*, 201 Conn. 174, 177, 513 A.2d 1183 (1986) (testimony of clinical psychologist that defendant's behavior was consistent with someone in "transient, disassociative state" (internal quotation marks omitted)); *State* v. *Elliott*, supra, 177 Conn. 3 (psychiatrist testified to defendant's overwhelming fear of victim and other long-term stressors). The defendant in the present case did not present the testimony of a mental health expert to support his request for an instruction.

State v. Henderson

the circumstances of the killing itself on direct examination'' but stated that, after he killed the victim, he called his uncle while ''still in shock,'' fell asleep, and then ''thought it was a dream when [he] woke up . . . .'' (Internal quotation marks omitted.) Id., 1253. During cross-examination, when asked whether he wrapped a lamp cord around the victim's neck, the defendant responded: ''I blanked out. I don't remember none of that.'' (Internal quotation marks omitted.) Id. The court held that the defendant had not provided enough evidence to allow a jury to find that he had suffered from any kind of extreme emotional disturbance while killing the victim, given his refusal to discuss the murder aside from his ''blank[ing] out'' and the lack of any other evidence to support his claim of memory loss. Id., 1253– 54. Given the sparsity of this testimony, the court in *Wells* considered other evidence showing the defendant's intent to kill and determined that, because the defendant admitted to having angry, jealous thoughts about killing the victim *prior* to the murder, that weighed more heavily than the defendant's assertion that he did not remember the attack. Id., 1253 and n.2.

The defendant in the present case provides slightly more detail than did the defendant in *Wells*, using the words ''shocked,'' ''surprised,'' and ''angry'' to describe his emotional state prior to his claimed blackout. Nevertheless, these are ordinary emotions and not the extreme, intense feelings required to establish that his reason had been overborne. See, e.g., *State* v. *Santos*, 41 Conn. App. 361, 368–69, 675 A.2d 930 (defendant's stated anger, when combined with other evidence showing he was in control of his actions, was insufficient to establish that he had acted under the influence of extreme emotional disturbance), cert. denied, 237 Conn. 932, 677 A.2d 1374 (1996). Moreover, given the emphasis in *Wells* on the defendant's angry, jealous thoughts about killing the victim prior to the murder; see *People* v.

State v. Henderson

*Wells*, supra, 101 App. Div. 3d 1253 and n.2; the defendant's claim of entitlement to an extreme emotional disturbance defense instruction in the present case is heavily undercut by his actions before the crime. He threatened the victim and her mother the week before the murder and expressed a desire to exact revenge against the victim over Thanksgiving weekend in his November 25, 2019 text message conversation with a friend, agreeing that the victim would "get what she did to [him] in the next chapter" because "karma is a bitch" and warning his friend to "hold it down" if "anything [were] ever to happen to [him] . . . ." From the time he quit his job at Walmart, on November 22, 2019, he knew that the victim's patience had run its course, that he could no longer stay in her apartment, and that the relationship was over. On November 27, she texted him: "I just don't want to do this anymore. I'm asking you to please please please leave." All of this evidence undermines the defendant's claim that he was "shocked" and "surprised" upon the victim's attempt to force him to leave.

The defendant, however, also relies on *State* v. *Person*, supra, 236 Conn 353–56, to argue that the content of his testimony should not preclude him from receiving the extreme emotional disturbance defense instruction because circumstantial evidence may be sufficient to establish the elements of the defense. In *Person*, the victim ended her romantic relationship with the defendant, who subsequently harassed her and her new boyfriend, making threatening phone calls to them after he saw the boyfriend entering the victim's apartment building. Id., 354–55. The defendant in *Person* forcibly entered the victim's apartment that same evening to retrieve his belongings, and, when the victim returned home to find him there and attacked him with Mace, the defendant fatally stabbed her. Id., 346, 355. Because the defendant testified that he was not that upset that

State v. Henderson

the victim had begun dating someone else, the trial court declined to instruct the jury on the defense of extreme emotional disturbance. Id., 346–47. This court held, however, that the trial court should have given the instruction, despite the defendant's testimony about not being that upset, because there was sufficient evidence for an instruction on the defense. Id., 353–54, 356. Beyond the relationship history between the victim and defendant, and the defendant's witnessing the new boyfriend entering the victim's apartment building, this court emphasized the defendant's "out of it," "tired, drained and exhausted" appearance after the murder, and his "emotional" behavior after he turned himself in to the police, which included crying and begging officers to "just lock [him] up," in holding that there was sufficient evidence for a rational juror to find that the defendant had established the defense by a preponderance of the evidence. (Internal quotation marks omitted.) Id., 356.

We disagree with the defendant's reliance on *Person*. The facts of the present case are distinguishable because the defendant's conduct here was more controlled, and there was no postcrime emotional breakdown during which the defendant expressed remorse like that of the defendant in *Person*. In contrast, the defendant in the present case was able to carry out ordinary interactions with family members, such as getting coffee for his daughter and having lengthy phone conversations with his mother, without breaking down, and he avoided the police for nearly one week. These actions are not evidence of shock and denial, as the defendant claims, but, rather, demonstrate calculated attempts to conceal his location and to evade accountability, especially when viewed in combination with the threats he had communicated in the week prior to the murder. Further, to the extent that the majority opinion in *Person* can be read, as Justice Callahan wrote in dissent, to establish

State v. Henderson

"a per se rule that anyone who kills a former girlfriend or boyfriend is entitled to a jury instruction on extreme emotional disturbance"; id., 362 n.1 (*Callahan, J.*, dissenting); we disavow any such understanding of that holding.[9]

The defendant further claims that, because he did not attempt to conceal his involvement in the crime and was arrested with blood on his shoes, hat, and phone, his conduct is distinguishable from that of the defendants in cases such as *State* v. *Crespo*, 246 Conn. 665, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999), in which post-crime efforts to cover up or to destroy evidence of the crime defeated an extreme emotional disturbance finding. Id., 673, 682; see also *State* v. *Cannon*, 165 Conn. App. 324, 338, 138 A.3d 1139 (defendant who hid victim's body, cleaned crime scene, and lied about victim's whereabouts did not experience extreme emotional disturbance), cert. denied, 321 Conn. 924, 138 A.3d 285 (2016). The defendant in the present case, however, lacked the opportunity to take concealment steps equivalent to those present in *Crespo* or *Cannon* because J witnessed the stabbing and ran to call the police. With only a few minutes to act, the defendant did not have the opportunity to conceal the victim's body or to clean up the crime scene as the defendants in *Crespo* and *Cannon* had. Furthermore, the defendant's representation that he was arrested wearing a "blood-stained" hat and shoes and carrying a "bloodstained" phone is misleading, as it suggests that, after the murder, he was wandering in a state of disbelief or shock. The blood traces on the defendant's black shoes, black

_____

[9] We further note that *Person* does not address the objective element of the defense of extreme emotional disturbance and does not discuss whether the explanation for the defendant's extreme emotional disturbance was reasonable. We leave to another day whether this omission affects *Person*'s precedential value with respect to the defense of extreme emotional disturbance.

State v. Henderson

hat rim, and black phone case were small and faint, and were visible only upon close inspection;[10] their presence was insufficient in light of the defendant's efforts to evade law enforcement, exhibiting consciousness of guilt and self-control, which are inconsistent with extreme emotional disturbance. Because the defendant failed to provide sufficient evidence showing that he had lost self-control, we conclude that the trial court correctly determined that a rational juror could not find by a preponderance of the evidence that the defendant was suffering from an extreme emotional disturbance, and, therefore, the court properly declined to instruct the jury on that affirmative defense.

The judgment is affirmed.

In this opinion MULLINS, C. J., and McDONALD, D'AURIA, DANNEHY and BRIGHT, Js., concurred.

ECKER, J., dissenting. The first sentence of the majority opinion reveals the concern animating its legal analysis. Quoting an opinion written by a dissenting justice nearly thirty years ago, the majority expresses its desire to eschew a " 'per se rule that anyone who kills a former girlfriend or boyfriend is entitled to a jury instruction on extreme emotional disturbance.' " See *State* v. *Person*, 236 Conn. 342, 362 n.1, 673 A.2d 463 (1996) (*Callahan, J.*, dissenting). As a matter of public policy, I am in no position to say that this concern is unreasonable, although I trust our juries, properly instructed on the law, to ensure that only factually supported claims of

---

[10] We also note that these were the only blood stains that were found upon his arrest. The defendant asserts that there is no evidence that he disposed of any bloody clothing, which shows that he did not attempt to conceal his crime. It does not appear that the clothing that the defendant was wearing at the time of his arrest was examined by the police, and there was no evidence presented at trial establishing whether he had disposed of any bloody clothing. The defendant, however, testified that, after stabbing the victim, he packed a bag that included a change of clothing.

353 Conn. 433 SEPTEMBER, 2025 457

State v. Henderson

extreme emotional disturbance will prevail at trial, and point out that the defense is one of mitigation, not justification; the most that a defendant can gain from it is a lengthy prison sentence for manslaughter. See General Statutes § 53a-54a (a); see also General Statutes §§ 53a-55 and 53a-35a (6). My fundamental concern is that we are not authorized to make public policy in this case. The only question properly before this court is whether, *viewing the evidence in the light most favorable to the defendant*, Carlton Henderson, any rational juror might credit his extreme emotional disturbance defense. If so, the decision to mitigate the crime to manslaughter is not for a judge to make.

Courts must be especially cautious to avoid judicial lawmaking in an area in which the legislature has spoken. I will be the first to acknowledge that such lawmaking, which some call policymaking, often is an appropriate judicial function. Judges are both empowered and obligated to develop legal rules and standards in contexts involving core judicial functions, including not only the promulgation of requirements governing legal procedures, but also in connection with various fields of substantive law—the prime examples being constitutional law and common law.[1] But statutory law is different. Although what may be considered judicial lawmaking is sometimes necessary to fill in statutory gaps or to resolve ambiguities,[2] courts are not permitted to improve

_____

[1] See, e.g., *State* v. *Purcell*, 331 Conn. 318, 362, 203 A.3d 542 (2019) (holding that policy considerations required more demanding prophylactic rule under state constitution to safeguard rights of accused to advice of counsel during custodial interrogation); *L. L.* v. *Newell Brands, Inc.*, 351 Conn. 262, 263–66, 330 A.3d 53 (2025) (declining on policy grounds to recognize common-law cause of action for loss of filial consortium).

[2] "We often must legislate interstitially to iron out inconsistencies within a statute or to fill gaps resulting from legislative oversight or to resolve ambiguities resulting from a legislative compromise." (Footnote omitted.) *U.S. Bulk Carriers, Inc.* v. *Arguelles*, 400 U.S. 351, 354, 91 S. Ct. 409, 27 L. Ed. 2d 456 (1971); see *Borelli* v. *Renaldi*, 336 Conn. 1, 72, 243 A.3d 1064 (2020) (*Ecker, J.*, dissenting) ("in an age of statutes, there remains a vital judicial role to fill, in case-by-case adjudication, the numerous gaps, inter-

State v. Henderson

a statute by construction. See, e.g., *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 316 Conn. 790, 803–804, 114 A.3d 1181 (2015) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language").

Whether we like it or not, we must accept the fact that the legislature chose to enact a penal statute expressly providing, in relevant part, that "it shall be an affirmative defense [to the crime of murder] that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." General Statutes § 53a-54a (a). We recently reaffirmed that there are "two elements of [the affirmative defense of extreme emotional disturbance]: (1) the defendant committed the offense under the influence of extreme emotional disturbance; and (2) there was a reasonable explanation or excuse for the defendant's extreme emotional disturbance." (Internal quotation marks omitted.) *State* v. *Parris*, 352 Conn. 652, 668, 338 A.3d 1139 (2025). This standard "is objective in its overview, but subjective as to the defendant's belief." (Internal quotation marks omitted.) Id. The unique nature of this particular hybrid, subjective-objective amalgam no doubt presents its challenges, but, as we observed in *Parris*, the standard is straightforward

stices, and ambiguities that emerge as legislative designs meet the infinitely varied and unpredictable conditions of the real world"); see also B. Cardozo, The Nature of the Judicial Process (1921) pp. 15–17, 113–115, 129; E. Peters, "Common Law Judging in a Statutory World: An Address," 43 U. Pitt. L. Rev. 995, 1002–1005 (1982).

State v. Henderson

enough to communicate to a jury. See id., 675–76 n.12. The statute further provides that the defendant bears the burden of establishing the elements of the defense by a preponderance of the evidence. Id., 669. If the jury finds that the defendant has met this burden, then the defendant cannot be found guilty of murder, but is guilty of manslaughter instead. See id., 665.

There are two important, supplemental legal principles that are used to determine whether a defendant is entitled to a jury instruction on the statutory defense of extreme emotional disturbance. Both are well settled. First, a defendant is entitled to the instruction "only if there is sufficient evidence for a rational juror to find that all the elements of the defense are established by a preponderance of the evidence." *State* v. *Person*, supra, 236 Conn. 353. Second, and of critical importance in the present case, a reviewing court is required to construe the facts in the light most favorable to providing the instruction. See, e.g., *State* v. *Belle*, 215 Conn. 257, 273, 576 A.2d 139 (1990), overruled on other grounds by *State* v. *Person*, 236 Conn. 342, 673 A.2d 463 (1996); *State* v. *Jusino*, 163 Conn. App. 618, 630, 137 A.3d 65, cert. denied, 321 Conn. 906, 136 A.3d 643 (2016). Whether a defendant is entitled to the instruction is a question of law, subject to plenary review. See, e.g., *State* v. *Honsch*, 349 Conn. 783, 817, 322 A.3d 1019 (2024); see also *State* v. *Person*, supra, 352.

I find it necessary to dwell briefly on the second of these points—the requirement that the court view the facts in the light most favorable to the defendant— because it serves to illuminate the flaw in the majority's legal analysis. This requirement implicates the constitutional right to a jury trial, which is not a trifle.[3] The jury

---

[3] The right to a trial by jury is enshrined in both the constitution of the United States and the Connecticut constitution. See U.S. Const., amend VI ("[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury"); U.S. Const., amend. VII ("[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right

State v. Henderson

right "is fundamental in our judicial system, and . . . includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded [people] passed [on] by the jury and not by the court." (Internal quotation marks omitted.) *Howard* v. *MacDonald*, 270 Conn. 111, 128, 851 A.2d 1142 (2004). It follows that judges may not take away factual issues from the jury as a means of implementing fact intensive policy choices that the legislature has chosen to submit to the jury. With regard to criminal cases, we recently explained that "[t]he jury trial provisions in the [f]ederal and [s]tate [c]onstitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." (Internal quotation marks omitted.) *State* v. *Langston*, 346 Conn. 605, 634, 294 A.3d 1002 (2023), cert. denied,    U.S.   , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024); see also *State* v. *LaBrec*, 270 Conn. 548, 556, 854 A.2d 1 (2004) ("the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence" (internal quotation marks omitted)). A request to charge on a theory of defense of the general nature involved in the present case must be assessed with these considera-

of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law"); Conn. Const., art. I, § 8 ("the accused shall have a right . . . in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury"); Conn. Const., art. I, § 19 ("[t]he right of trial by jury shall remain inviolate"); see also *State* v. *Perrella*, 144 Conn. 228, 231, 129 A.2d 226 (1957) ("[t]he purpose and effect of [article first, §§ 8 and 19, of] the Connecticut constitution is to preserve and make available to litigants as a political right the institution of jury trial, in all its essential features as derived from our ancestors and now existing by force of our common law" (internal quotation marks omitted)).

State v. Henderson

tions in mind. See, e.g., *State* v. *Smith*, 262 Conn. 453, 470, 815 A.2d 1216 (2003) ("[T]he jury's role as [fact finder] is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a [theory of defense], if it is requested. . . . Otherwise, the defendant would lose the right to have the jury pass [on] every factual issue fairly presented by the evidence." (Internal quotation marks omitted.)).

In my view, the majority fails at the most important points to construe the evidence in the light most favorable to the defendant. This standard is well established. In assessing criminal appeals challenging the sufficiency of the evidence, we routinely review the record "in the light most favorable" to sustaining the verdict, which we have explained means affirming the findings of the trier of fact if they are "reasonably supported by the evidence and the logical inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Evans*, 203 Conn. 212, 238, 523 A.2d 1306 (1987). The "light most favorable" standard is also routinely used in a variety of contexts in civil cases, including the procedures applicable to motions for summary judgment, in which the nonmoving party must be "given the benefit of all favorable inferences that can be drawn." *Evans Products Co.* v. *Clinton Building Supply, Inc.*, 174 Conn. 512, 516, 391 A.2d 157 (1978).[4] In reviewing whether

_____

[4] The summary judgment analogy is apt in this case because we have said that disposition by summary judgment "is particularly inappropriate [when] the inferences [that] the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." (Internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 111, 639 A.2d 507 (1994). The same is true in criminal cases, in which "[t]he state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged." *State* v. *Rodriguez*, 180 Conn. 382, 404, 429 A.2d 919 (1980); see also *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 79, 136 A.3d 596 (2016) (when defendant's state of mind "is susceptible to more than one interpretation," it is properly decided by jury).

State v. Henderson

the jury should have been instructed on a particular defense, the standard requires us to "adopt the version of the facts most favorable to the defendant [that] the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Hargett*, 343 Conn. 604, 620, 275 A.3d 601 (2022); see also *Davis* v. *Strack*, 270 F.3d 111, 125 (2d Cir. 2001) ("light most favorable" analysis requires "drawing all reasonably permissible inferences in [the defendant's] favor"); *People* v. *McManus*, 67 N.Y.2d 541, 549, 496 N.E.2d 202, 505 N.Y.S.2d 43 (1986) ("light most favorable" analysis requires instruction to be given if any reasonable view of evidence would permit fact finder to find sufficient evidence for affirmative defense). It is accurate to say that "[t]his is perhaps the most lenient standard of review that exists in our law, and for good reason: the only consequence of a charge on a [defense] is that it permits the jury to resolve a factual issue, subject to all the procedural safeguards associated with verdicts based [on] insufficient evidence." *State* v. *Preston*, 248 Conn. 472, 484, 728 A.2d 1087 (1999) (*Berdon, J.*, dissenting).

Despite the authoritative (and constitutionally compelled) leniency of this standard, the majority at times appears to draw the most negative possible inferences and to view the facts in a manner that overlooks or dismisses as not credible many of the details that would tend to support the defendant's claim. Ultimately, the majority concludes that no rational juror could have found that the defendant was subjectively under the influence of an extreme emotional disturbance at the time of the homicide and, therefore, declines to address whether there was sufficient evidence to establish an objectively reasonable explanation or excuse for the defendant's emotional disturbance.[5] My own review of

[5] The majority also asserts that "[n]either party's brief addresses the objective element of the extreme emotional disturbance defense, which evaluates the reasonableness of the defendant's reaction." Footnote 6 of the majority opinion. While neither party's brief is a model of clarity with regard to the distinction between the objective and subjective prongs of the defense, both

353 Conn. 433 SEPTEMBER, 2025 463

State v. Henderson

the record convinces me that, viewing the facts in the light most favorable to the defendant, a rational juror could have concluded that the defendant had satisfied both the subjective and objective prongs of the defense. My analysis is focused on whether the defendant was in fact experiencing an extreme emotional disturbance at the time of the homicidal act, but it should be apparent from my discussion that a rational juror could have found that there was a reasonable explanation for his emotional state as well. The trial court's failure to give the instruction was therefore erroneous. Moreover, the error was harmful because, without a jury instruction on the matter, the defendant was deprived of the ability to mount his affirmative defense. I would therefore reverse the judgment of the trial court and remand for a new trial.

I

A

Viewed in the light most favorable to the defendant, the facts of this case and the reasonable inferences drawn therefrom could reasonably support the following version of events.[6] At the time of the homicide, the defendant was at his breaking point. His troubles began in childhood, when he was abruptly separated from his mother, sent to live with his grandmother, and then sent to live with his older sister when his grandmother died. It was at this vulnerable moment in his life that the defendant was first exposed to alcohol and drugs.

_____

address the "cause" or " 'basis' " of the defendant's purported extreme emotional disturbance. I therefore find the briefing on both elements of the defense to be adequate for appellate review.

[6] It is beside the point whether I personally find this version of events to be credible because I "do not sit as a thirteenth juror . . . ." (Internal quotation marks omitted.) *State* v. *Bush*, 325 Conn. 272, 304, 157 A.3d 586 (2017). The issue is whether a rational juror, viewing the evidence in the light most favorable to the defendant, could find that evidence sufficient to support the defendant's extreme emotional disturbance defense.

State v. Henderson

On one fateful occasion, he unknowingly consumed phencyclidine (PCP), thinking it was marijuana. The event had a profound impact on the trajectory of his life, causing him to become addicted to the drug and landing him in jail at just seventeen years old for a drug related offense.

The defendant's addiction to PCP was all-consuming. He was never able to hold down a job because he just "wanted to get high and hang out." Throughout his late teenage years and adult life, he was in and out of jail for drug related crimes. At one point, he tried to get sober and spent more than one month in an inpatient drug rehabilitation program, but it was no use. The constant drug abuse continued unabated and kept the defendant socially isolated. Several of his former employers "indicated that his behavior was kind of odd, but . . . they weren't able to speak . . . too much about it, as he kind of kept to himself." His neighbor never got to know him because "he was . . . not very personable." The one person he did see frequently, his uncle, enabled his addiction by drinking with him and allowing him to smoke PCP in his home. To make matters worse, the defendant, having already lost a brother in 2009, was "devastat[ed]" when his father died in 2017. He would go back to his father's house to get high and drink in the driveway. The defendant testified: "You know, it was like I couldn't leave that spot. I just couldn't leave it alone. I just really never recovered from it."

The defendant did have one saving grace: his long-term girlfriend, B, whom he described as his "one and only" and the love of his life. They moved in together in 2010. B worked full-time and provided the defendant with everything he needed. He admired her work ethic and called her "a beautiful person." Her son, J, lived with them. J viewed the defendant as "someone [he] could trust" and called him his "stepdad." The defendant loved them both and viewed them as his family.

State v. Henderson

In the months leading up to the homicide, the defendant's alcohol and drug abuse escalated. He was experiencing rapid mood swings, described by his uncle as "happiness one minute, sad and mean the next minute," and he became paranoid that B was seeing someone else. During this period, B grew increasingly frustrated with the defendant's drug abuse and inability to maintain employment. His addiction had been a consistent problem throughout their relationship, which generally made him feel "ashamed" and "like a little kid." As the defendant continued to abuse drugs and contemplated quitting his new job, B threatened to kick him out of their apartment. In a series of text messages, sent just ten days before the homicide, she warned: "You're about to fuck up what I thought was a good thing, a new beginning for us." "See this is what happens when you get high. You start not wanting to go to work. Your mind starts to play tricks on you, got you thinking I'm cheating . . . ." "I'm not doing this with you again. I knew something wasn't right but I thought to myself, no he wouldn't be that stupid, he almost lost his family once over that shit, lost his job, he wouldn't do that again but yet here we are." "I truly hope you're not out smoking dust, if you are, you might as well pack your shit. . . ."

But the defendant was his own worst enemy. Feeling "broken," he walked off his job at Walmart. That was the final straw for B, and she demanded that he move out. When he refused, she went to stay with her mother across the street and sent her son to stay with his biological father in Pennsylvania. The defendant was left alone in the apartment for nearly one week, including during the Thanksgiving holiday. During this time, B and her mother called the police to try to evict him and bought materials to change the locks on the doors. Meanwhile, the defendant was desperately texting B and begging her for another chance, even waiting for

State v. Henderson

her outside of her mother's house to ask her to come back home. She would not relent.

The evening before the homicide, B returned to the apartment with a plan "to get him out." She brought J back with her as well. Facing the immediate prospect of losing them both, the defendant stayed up the whole night drinking alcohol and smoking PCP. In the morning, in a state of exhaustion and intoxication, he asked B if she could bring him breakfast. She responded, "your f'ing car's out there, take yourself." When the defendant explained that he could not drive because he had "been drinking all night" and was "high," she reiterated her refusal and left the room. Then, the conflict suddenly turned physical. B came back toward the defendant with a knife in her hand, saying, "today, you're going to get the . . . F out of here. One way or another, you're getting out of here." The defendant was "shocked," "surprised," and "angry." They had never before had an argument involving a weapon and generally did not argue at all in J's presence.

All the defendant remembers of what happened next is wrestling the knife out of B's hand and fleeing the scene. He "blanked out" during the homicide itself. We know what occurred only because J witnessed the defendant putting B in a chokehold, stabbing her as she attempted to get to the front door, and repeatedly saying, "it's over, it's over," while attempting to pull her back into the apartment by her hair. The police also reported that the defendant fled the scene erratically, nearly running over two officers with his vehicle as they shouted at him to stop, driving over the grass and a street curb in the process.

In the immediate aftermath of the homicide, the defendant's emotions were "going up and down . . . ." He was not sure exactly what had taken place, but he knew "something had happened" and was "petrified."

State v. Henderson

Upon leaving the scene, he immediately drove to the local Dunkin' Donuts, where he was a regular customer. He needed "somewhere to think" and, as if on autopilot, sought the comfort of a familiar place that was a part of his routine. In his desperate emotional state, he also called his mother in Colorado, whom he had not seen in more than two decades, in addition to several other family members. He then drove around "aimlessly" and ended up traveling to New York City and back to Connecticut the same day. When he returned, he wandered around Hartford for several days, crying, thinking about B, and "hoping that she was okay."

B

The foregoing narrative is rooted in the evidence and reasonable inferences drawn therefrom. Perhaps most people would not credit the defendant's version of events. But it certainly would not be irrational to do so, and, for that reason, we are required to do so under the applicable standard of review. See, e.g., *State* v. *Hargett*, supra, 343 Conn. 620. The majority nonetheless concludes that no reasonable juror could find that there was sufficient proof that the defendant killed B while under the influence of an extreme emotional disturbance. I disagree. In my view, the majority's analysis misses both the forest and the trees.

The big picture overlooked by the majority is the circumstances as *subjectively* experienced by the defendant at the time of the homicide. Viewed in the light most favorable to the defendant, we must consider the factual context in which he was facing the loss of his girlfriend of ten years and the child he regarded as a stepson. These circumstances could be expected to cause unusually acute emotional turmoil for many people, and, for this defendant in particular, a jury would be well within the bounds of reason to find that the potential loss was likely to be experienced as cata-

State v. Henderson

strophic. Unlike people with a support network, material resources, and a mind unimpaired by an extreme drug addiction, the defendant was unequipped to withstand the crisis. The defendant was also about to lose his sole source of income and would need to find a new place to live with no plan for how he would survive. Perhaps of utmost importance, it would be reasonable to infer that the fraught nature of his situation took on a whole new dimension when B attempted to force the defendant out of the apartment at knifepoint.

Adding to this volatile mix was the emotional impact of the defendant's drug abuse itself. Chronic drug abuse is widely understood to interfere with mental and emotional functioning.[7] In the defendant's case, it would be reasonable to infer that his drug abuse was causing a form of paranoia, leading him to believe that B was cheating on him. B's text to him plainly indicated as much, saying, "this is what happens when you get high. . . . Your mind starts to play tricks on you, got you thinking I'm cheating . . . ." Again, these facts are in the record and must be credited by the court for present purposes.

Finally, the effect of the defendant's family history cannot be discounted as relevant to the emotional state that influenced his conduct on the day that he killed B when she confronted him with a knife. It would be reasonable to infer that the defendant's sudden separation from his mother as a young child, the loss of his grandmother (who was his primary caretaker), the death of his brother, and the death of his father just two years prior to the homicide were all contributing factors to his emotional state. It does not take a psycho-

---

[7] It is common knowledge that drug abuse interferes with emotional and cognitive functioning. See, e.g., National Institute on Drug Abuse, Understanding Drug Use and Addiction DrugFacts (June, 2018), available at https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last visited September 17, 2025).

State v. Henderson

logical expert to understand that a person with an
unusually troubled family history might have an out-
sized emotional reaction to an imminent breakup under
the foregoing circumstances. In this regard, it also may
have been relevant to the jury that the homicide took
place at the end of November, after the defendant was
left alone during the Thanksgiving holiday. The holidays
are often a time of heightened emotional distress for
people grappling with grief and family estrangement,[8]
and it would not have been unreasonable to infer that
the timing of B's departure intensified the defendant's
downward spiral. A rational juror could conclude that
these circumstances, combined with the defendant's
loss of family, food, and shelter—suddenly instantiated
by an immediate, direct threat of physical violence—
prompted in the defendant an extreme emotional distur-
bance within the contemplation of § 53a-54a (a).

Indeed, Connecticut courts have instructed juries on
the extreme emotional disturbance defense in situa-
tions involving far less oppressive circumstances. See,
e.g., *State* v. *Haynes*, 352 Conn. 236, 243, 336 A.3d 1139
(2025) (defendant stabbed girlfriend to death for threat-
ening to remove his dreadlocks); *State* v. *Person*, supra,
236 Conn. 353–56 (defendant stabbed ex-girlfriend to
death after she broke off short-lived engagement); *State*
v. *Raguseo*, 225 Conn. 114, 117–19, 622 A.2d 519 (1993)
(defendant killed victim for parking in his space); *State*
v. *Casey*, 201 Conn. 174, 176–78, 513 A.2d 1183 (1986)
(defendant killed neighbor for washing car and getting
soapy water into defendant's newly seeded lawn). Our
courts have also provided the jury instruction in situa-

[8] This phenomenon, by no means limited to individuals with substance
abuse or mental health problems, is well known and a frequent topic of
conversation around the year-end holidays. See, e.g., D. Gillison, National
Alliance on Mental Illness, The Most Difficult Time of the Year: Mental Health
During the Holidays (December 20, 2021), available at https://www.nami.org/
from-the-ceo/the-most-difficult-time-of-the-year-mental-health-during-the-
holidays/ (last visited September 17, 2025).

State v. Henderson

tions in which the defendant claimed extreme emotional disturbance, in part, due to intoxication similar to the influence of PCP in the present case. See, e.g., *State* v. *Aviles*, 277 Conn. 281, 308, 891 A.2d 935 (there was evidence "that [the defendant] had smoked 'dust' " before homicide), cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006); *State* v. *Kaddah*, 250 Conn. 563, 577, 736 A.2d 902 (1999) (there was evidence that defendant consumed alcohol prior to homicide, which could have combined with preexisting medical conditions to make him " 'not know what he was doing' "); *State* v. *Asherman*, 193 Conn. 695, 732, 478 A.2d 227 (1984) ("on the morning of the killing [the defendant] was so clearly under the influence of some drug or alcohol . . . that persons who had never seen him before came to that conclusion"), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

This brings us to the trees, which is to say the particular guidelines that the majority correctly identifies under our case law as providing assistance in assessing whether a defendant's subjective experience may qualify as an extreme emotional disturbance. See *State* v. *Elliott*, 177 Conn. 1, 9–10, 411 A.2d 3 (1979). First, the emotional disturbance cannot be "a mental disease or defect that rises to the level of insanity as defined by the Penal Code . . . ." Id. This necessarily means that a court may not take the issue from the jury merely because the extreme disturbance is not, in the court's estimation, sufficient to render the defendant unable "to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a). Second, the circumstances must have "exposed [the defendant] to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness . . . ." *State* v. *Elliott*, supra, 9. Third, the defendant must have "had an extreme emotional reaction to [the circumstances], as

State v. Henderson

a result of which there was a loss of self-control, and [the defendant's] reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.'' Id. Our doctrine, however, does not require a defendant to "have lost all ability to reason" in order to establish the defense. Id., 7. The guidelines "are neither conclusive nor exclusive," and the ultimate determination is for the trier of fact. (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 537, 180 A.3d 882 (2018); accord *State* v. *Forrest*, 216 Conn. 139, 148, 578 A.2d 1066 (1990).

The majority agrees that the first two *Elliott* factors are satisfied on this record. It is undisputed that the defendant was not suffering from a mental disease or defect that rose to the level of insanity at the time of the homicide. In addition, and importantly, the majority also concedes that, viewed in the light most favorable to the defendant, B's "introduction of a knife . . . elevate[d] this particular scenario to one that could allow a rational juror to find by a preponderance of the evidence that this particular defendant was exposed to an 'extremely unusual and overwhelming state.' " The majority acknowledges that the defendant "struggled with addiction to both alcohol and PCP" and "faced the imminent loss of his home, family, and financial security," such that the prospect of his relationship ending "may arguably be understood to present a stressor beyond the 'mere annoyance or unhappiness' that would be experienced in an ordinary romantic breakup."

Nonetheless, upon reaching the third guideline, the majority concludes that there is insufficient evidence for "a rational juror to find by a preponderance of the evidence that the defendant lost self-control or that his ability to reason was overborne by extreme, intense

State v. Henderson

feelings.''[9] I understand that some people, perhaps most of them, would not find the defendant's defense credible. But I feel confident that there is ample room for reasonable disagreement on this record when the evidence is properly viewed in the light most favorable to the defendant.

I will briefly list six of many facts from which, viewing the evidence in the light most favorable to the defendant, a rational juror could infer that the defendant's emotional state overwhelmed his self-control and faculties of reason. First, assuming that the defendant was testifying truthfully, as we must, the facts of this particular case make it reasonable to harbor real doubt that the defendant was in control of himself when he killed his source of food, shelter, and other basic life necessities. Second, the defendant testified that he "went into a blur" and "blanked out" for most of the incident. Again, assuming the veracity of his testimony, that men-

[9] Although the matter is not before us in the present case, I pause here to draw attention to the apparent contradictions presented by the third *Elliott* factor. First, the text of the statute itself requires only that the defendant act "under the influence" of an extreme emotional disturbance. General Statutes § 53a-54a (a). To act "under the influence" of an emotional state strikes me as different from the all-encompassing condition implied by a loss of self-control or a failure of reason. See *State* v. *Elliott*, supra, 177 Conn. 9. Second, the first *Elliott* factor requires that the emotional disturbance not be "a mental disease or defect that rises to the level of insanity as defined by the Penal Code . . . ." Id. In Connecticut, the Penal Code defines legal insanity as a person's lack of "substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a). Given that the third *Elliott* factor and legal insanity both involve a person's volitional lack of capacity to control their actions, it would appear that the two affirmative defenses overlap in a way that makes them very difficult to disentangle. For this reason, at least one commentator has suggested that the first *Elliott* factor "is wrong and should be eliminated." J. Blue, "Defining Extreme Emotional Disturbance," 64 Conn. B.J. 473, 480 (1990). These concerns, while not raised, reinforce the importance of treating the *Elliott* factors as "understandable guidelines" rather than "elements" substituted for those specified by the legislature. (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 537.

State v. Henderson

tal state is the very embodiment of the loss of self-control or reason. Third, the defendant testified that he felt "angry," "shocked," and "surprised" when B came toward him with a knife. The third *Elliott* guideline explicitly lists "anger" as one of the "extreme intense feelings" capable of overbearing reason. *State* v. *Elliott*, supra, 177 Conn. 9. It would also be reasonable to infer that the defendant's feelings of anger and shock were substantially intensified after having stayed up the entire night consuming alcohol and PCP. Fourth, again assuming the veracity of the defendant's testimony that he had never previously argued with B in the presence of J, the very fact that the defendant engaged in violence in front of J tends to demonstrate a loss of self-control. Fifth, during the homicide, the defendant repeatedly uttered the words "it's over, it's over . . . ." It is unclear if he was referring to B's life or to their relationship, or if he was even aware of what he was saying, but this repetitive mantra could also be seen as signifying a state beyond coherent speech, which is at times symptomatic of a temporary loss of reason. Sixth, and finally, the defendant left the scene in a highly erratic fashion, nearly knocking over two police officers with his vehicle.[10]

Taking all of these factual details in combination with the remainder of the record, and viewing the evidence in the light most favorable to the defendant, there is more than enough evidence for a rational juror to find that the defendant was not in control of his actions or faculties of reason at the time of the homicide.

[10] The majority characterizes the defendant as executing a careful maneuver "through a narrow gap between a police cruiser and a fence," minimizing the officers' testimony that the defendant had accelerated his vehicle directly toward them and sped over the grass to make his escape. Viewing the evidence in the light most favorable to the defendant, the same event could instead be characterized as a chaotic exit reflecting a continuing loss of emotional control, with the defendant narrowly avoiding the police cruiser and the fence by a stroke of luck.

State v. Henderson

## II

One way to see how the majority fails to view the evidence in the light most favorable to providing the instruction is by examining its characterization of the defendant's emotional state before, during, and after the homicide, as well as its misplaced focus on the defendant's consciousness of guilt. With respect to the majority's description of the defendant's actions in the days leading up the homicide, the majority quotes the testimony of B's mother. At trial, she recounted that the defendant, in an attempt to convince B to move back home, said that, if B did not return, "it was going to [be] bad, things were going to be bad, and did she really want to throw away ten years of a relationship?" The majority points to this testimony as evidence that the defendant "threatened [B] and her mother" prior to the homicide. I agree that one could interpret the prediction that "things were going to [be] bad" as an implied threat. But there are other reasonable interpretations—indeed, B's mother herself did not characterize the defendant's words as a threat—and we are required to credit these benign interpretations for present purposes. For example, the defendant's statement could reasonably be construed as meaning that "things were going to [be] bad" for *the defendant*, or that B would miss the defendant when he was gone.

Similarly, the majority makes much of the defendant's text messages in the week leading up to the homicide, in which he lamented the breakup in a conversation with a friend. In response to the defendant's expression of distress, his friend texted: "Yeah, bro. Keep your head up. Karma is a bitch. And it is definitely real. She will get what she did to you in the next chapter." The defendant replied: "Word, bro. Next chapter. You already know karma's a bitch." The friend texted: "There is no doubt about it. If she kept it real, it would have been a positive karma. But being that it must have

State v. Henderson

been some bullshit she pulled. The same or worse of the bad will fall her way. You just do you and don't let it break you. Hold tight and hold strong.'' The defendant answered: ''I'm holding on strong, but if anything was to ever happen to me, hold it down, my boy, for real.'' The majority describes the defendant's text messages as ''express[ing] a desire to exact revenge against [B] . . . .'' Again, maybe so. But, construed in the light most favorable to the defendant, it would be reasonable to interpret his statements as a way of saying that B would ultimately come to regret her decision. The dialogue also suggests concern about the defendant's ability to survive the breakup (''if anything was to ever happen to me'') rather than any consequences for B. In my view, it is a stretch to interpret the exchange as expressing an intention on the defendant's part to personally exact revenge on B. In any event, that interpretation runs contrary to the required standard under which we must view the evidence.

The majority takes the defendant's purported threat and ''desire to exact revenge'' in the week leading up to the homicide to undermine the defendant's claim that he felt ''shocked'' and ''surprised'' when B attempted to force him to leave at knifepoint. Without directly saying so, the majority seems to imply that the defendant was not under the influence of an extreme emotional disturbance at the time of the homicide because he had planned and intended to harm B for at least one week prior to the event. Perhaps that was the case, although I am not certain in my own mind that the evidence supports such an inference. Regardless, a rational juror could reasonably conclude otherwise on this record.

Moreover, as the majority recognizes, our case law holds that an extreme emotional disturbance ''need not necessarily have been a spontaneous or sudden occurrence'' and ''may have simmered in the defendant's mind

State v. Henderson

for a long period of time . . . .'' (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 533; see *State* v. *Elliott*, supra, 177 Conn. 8 (extreme emotional disturbance may be ''brought about by a significant mental trauma that caused the defendant to brood for a long period of time and then [to] react violently, seemingly without provocation''). This principle has consequences for how we look at the evidence in the present case. The fact that the defendant was aware of B's desire to end the relationship does not undercut the possibility that he experienced an extreme emotional disturbance the morning of the homicide, when he was no longer able to remain in denial that the relationship was really over. He had obviously been ''brood[ing]'' about the topic for weeks, discussing it with his uncle, his friend, and B herself. *State* v. *Elliott*, supra, 8. His fear of the relationship ending was accompanied by increased drug consumption, mood swings, and paranoid thoughts of B seeing someone else. If we construe the evidence in the light most favorable to the defendant, a rational juror could have found that the defendant's reaction the morning of the homicide was a paradigmatic example of a simmering emotional disturbance reaching its boiling point.

The majority's failure to apply the proper standard of review is similarly demonstrated by its treatment of the defendant's conduct following the homicide. Thus, the majority asserts that ''there was no postcrime emotional breakdown during which the defendant expressed remorse,'' contrasting the defendant's behavior with the tearful, emotional display of the defendant at the police station in *State* v. *Person*, supra, 236 Conn 354–56. The majority also repeatedly highlights the defendant's trip to Dunkin' Donuts as evidence that his conduct was ''controlled'' and that he was engaging in ''everyday activities'' immediately following the homicide. These interpretations strike me as decidedly off base.

State v. Henderson

As an initial matter, construing the evidence in the light most favorable to the defendant, a rational juror could find that the defendant experienced a remorseful, emotional breakdown. He wandered around Hartford for several days, crying, hoping that B was okay, and making no attempt to remove his bloodstained clothing. When he eventually made his way to the doorstep of a friend he had not seen in years, he looked "sad" and told her that "all he's been doing is crying." Moreover, it is commonly understood that the aftermath of a disturbing, emotional experience might be different for different people. Cf. *State* v. *Campbell*, 149 Conn. App. 405, 430, 88 A.3d 1258 ("human reactions to stressful circumstances that give rise to a fight or flight response are matters that fall within the common experience of the average juror"), cert. denied, 312 Conn. 907, 93 A.3d 157 (2014). As counsel for the defendant stated at oral argument before this court, in assessing whether there is sufficient evidence to warrant an instruction for extreme emotional disturbance, "we don't demand that the defendant . . . collapse on the floor in a catatonic state." Our courts generally appreciate the variable nature of human responses and have routinely provided an extreme emotional disturbance instruction to defendants who did not break down in tears upon arrest. See, e.g., *State* v. *Raguseo*, supra, 225 Conn. 122 ("the defendant had not appeared to be agitated or shaking, and responded to questions calmly"); *State* v. *Casey*, supra, 201 Conn. 177 ("the defendant was 'unusually calm,' 'like he was a shell' and . . . he 'didn't really seem to respond too much to the situation' "); *State* v. *Elliott*, supra, 177 Conn. 2–3 ("the defendant was calm and able to comprehend and answer questions").

The Dunkin' Donuts example is also illustrative in this regard. Perhaps the conduct of the defendant reflects the callousness of a cold-blooded murderer. On the other hand, if the defendant's version of events is true, a

State v. Henderson

rational juror could view the defendant's trip to Dunkin' Donuts as the action of a person in a virtual stupor, hanging tightly to routine until his senses return; no person in full control of their faculties, after all, would casually stop at a local coffee shop wearing bloodstained clothing while driving the vehicle that the police had just seen speeding away from the scene of a brutal stabbing. The defendant's other conduct in the days following the homicide could reasonably suggest that he was overwhelmed and seeking comfort in familiar places and people.

I am especially wary of using a defendant's post-crime conduct to determine whether he was under the influence of an extreme emotional disturbance during the homicide itself. Such an analysis overlooks the fact that mental states are often transient and fluid. Our law insists on this psychological truism specifically as it relates to criminal mens rea. It is well established that "intent [can] be formed instantaneously and [does] not require any specific period of time for thought or premeditation for its formation." (Internal quotation marks omitted.) *State* v. *Cooper*, 227 Conn. 417, 444, 630 A.2d 1043 (1993). If we accept that a mental state can be formed in an instant, then we must also accept that it can be replaced by a different state of mind in an instant. So, too, and perhaps more so, with human emotions, as we know from our daily observations of human behavior.

With respect to the affirmative defense of extreme emotional disturbance, moreover, a defendant need only demonstrate that he was "under the influence" of such a disturbance when he "committed the proscribed act or acts . . . ." General Statutes § 53a-54a (a); see *State* v. *Campbell*, supra, 328 Conn. 509–11 (rejecting claim that defendant was under influence of extreme emotional disturbance because evidence did not establish his emotional state "at the exact time of the shooting"). There is nothing in the statute requiring a defendant to show that the emo-

State v. Henderson

tional disturbance continued beyond the time of the homicide itself. Emotional lability is a fact of life, more so for some than others, and it is up to the jury to determine whether it finds credible the timing and extent of any rapid changes in emotion that may be reflected in the defendant's version of events.[11]

I am similarly unpersuaded by the majority's reliance on *State* v. *Jusino*, supra, 163 Conn. App. 634, for the proposition that " 'consciousness of guilt . . . is entirely inconsistent with an extreme emotional disturbance defense . . . .' " I cannot make sense of this notion. Evidence tending to show a defendant's consciousness of guilt is generally used to show "that a defendant is indeed

_____

[11] The majority's focus on the defendant's posthomicide conduct is particularly suspect because it relies heavily on New York precedent rather than Connecticut case law. See *Zamora* v. *Phillips*, Docket No. 04-CV-4093 (JFB), 2006 WL 2265079, *6 (E.D.N.Y. August 8, 2006) ("[i]n determining whether a [defendant] has acted out of a loss of [self-control], the court will look at the [defendant's] conduct before and after the homicide"); *People* v. *Dominguez*, 226 App. Div. 2d 391, 391, 640 N.Y.S.2d 583 (defendant's conduct after homicide was "inconsistent with the loss of control associated with extreme emotional disturbance"), appeal denied, 89 N.Y.2d 921, 677 N.E.2d 295, 654 N.Y.S.2d 723 (1996); *People* v. *Feris*, 144 App. Div. 2d 691, 692, 535 N.Y.S.2d 17 (1988) (defendant's appearance prior to homicide and his conduct following homicide were inconsistent with loss of control associated with extreme emotional disturbance). It is true, as the majority observes, that we have looked to the decisions of New York courts in construing the statutory language of § 53a-54a (a) because our murder statute "is almost a literal copy of New York Penal Law § 125.25 (1) (a) . . . ." *State* v. *Ortiz*, 217 Conn. 648, 654–55 n.6, 588 A.2d 127 (1991); see also *State* v. *Elliott*, supra, 177 Conn. 4–5 and n.3. But the decisions of our sister states do not bind this court, and we should not reflexively rely on New York precedent when there is reason to doubt its cogency. We should be particularly cautious in doing so when we move beyond the realm of statutory construction, where it often makes sense to adopt persuasive, out-of-state precedent when our statutes are nearly identical, and into the different realm of assessing which types of evidence we will consider in determining whether the proof is sufficient to permit the jury to decide whether a particular defense has been established as a factual matter. In assessing whether a defendant was under the influence of an extreme emotional disturbance at the time of a homicide, we should utilize a more nuanced approach that is sensitive to the volatile, variable and transient nature of human emotion.

State v. Henderson

guilty.'' (Internal quotation marks omitted.) *State* v. *Honsch*, supra, 349 Conn. 812. A person who kills while under the influence of an extreme emotional disturbance is indeed guilty—of committing the serious crime of manslaughter—and consciousness of guilt is consistent with the prescribed emotional state. Consciousness of guilt may be inconsistent with insanity under Connecticut law,[12] but the extreme emotional disturbance defense is unavailable if the defendant is legally insane. See *State* v. *Elliott*, supra, 177 Conn. 9; see also footnote 9 of this opinion. It follows that a defendant under the influence of an extreme emotional disturbance must be able to understand the wrongfulness of his actions. Additionally, a defendant need not ''have lost all ability to reason'' to demonstrate that he was experiencing an extreme emotional disturbance at the time of the homicide. *State* v. *Elliott*, supra, 177 Conn. 7. The defendant might well experience a loss of self-control due to extreme, intense feelings while still understanding that his conduct is wrong. It is no wonder, then, that a defendant who committed a homicide under the influence of an extreme emotional disturbance might try to evade detection in the aftermath of the crime, particularly as he begins to appreciate the enormity of the consequences of his actions.

Connecticut courts have consistently recognized that consciousness of guilt does not necessarily negate the presence of an extreme emotional disturbance. See, e.g., *State* v. *Aviles*, supra, 277 Conn. 285–86, 307 (court provided instruction when defendant fled and hid from police); *State* v. *Ortiz*, 217 Conn. 648, 651–52, 588 A.2d 127 (1991) (court provided instruction when defendant dragged victim's body into alley and drove away in vehicle); *State* v. *Elliot*, supra, 177 Conn. 2–3 (court provided instruction when defendant fled one-half mile away); see

_____

[12] See General Statutes § 53a-13 (a) (defining legal insanity in relevant part as ''lack[ing] substantial capacity, as a result of mental disease or defect . . . to appreciate the wrongfulness of his conduct'').

State v. Henderson

also *State* v. *O'Brien-Veader*, 318 Conn. 514, 520–22, 122 A.3d 555 (2015) (court provided instruction when defendant hid victim's body, cleaned up, hid bloody clothing and weapon, and socialized with friends immediately after killing victim). The majority argues that *O'Brien-Veader* "lacks any precedential value in this context because this court was not asked in that case to consider whether the evidence warranted an extreme emotional disturbance defense instruction." However, regardless of whether the issue was actually adjudicated, *O'Brien-Veader* and our other cases involving extreme emotional disturbance have enormously illustrative value in showing how the defense is implemented in our trial courts. When the instruction was given, it is reasonable to assume, at the very least, that the trial court considered it appropriate to do so. See *State* v. *Jackson*, 304 Conn. 383, 423, 40 A.3d 290 (2012). ("[i]f . . . the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury" (internal quotation marks omitted)). Moreover, if there was no objection, we must presume that the state conceded that there was sufficient evidence to merit providing the instruction to the jury.

In the present case, the fact that the defendant displayed consciousness of guilt in the hours and days following the homicide is of limited relevance to his mental state during the homicide itself and, in any event, reflects a state of mind consistent with the guilt attributable to his commission of a homicide. A rational juror could credit the defendant's testimony that he "went into a blur" and "blanked out" while committing the crime, quickly left the scene knowing "something had happened," and felt "scared" that he might have done serious harm to or even killed B. Under such circumstances, it would make sense that the defendant was "petrified" when his mother suggested turning himself into the police and that he attempted to evade law enforcement in the days following the homicide.

State v. Henderson

Juries are well equipped to make the fact based and subtle assessments about human emotions required to determine the appropriate level of culpability under § 53a-54a (a). Indeed, the reality appears to be that, when juries are provided with the instruction, the defense of extreme emotional disturbance fails to persuade juries in most situations involving defendants who have murdered, or attempted to murder, a former wife or girlfriend. See S. Kirschner et al., "The Defense of Extreme Emotional Disturbance: A Qualitative Analysis of Cases in New York County," 10 Psychol. Pub. Policy & L. 102, 115 (2004); see also, e.g., *State* v. *Forrest*, supra, 216 Conn. 141–42; *State* v. *Fair*, 197 Conn. 106, 107–109, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986). In any event, the legislature, not the courts, should decide if the defense should be denied to " 'anyone who kills a former girlfriend or boyfriend,' " as the majority frames the issue. Upon consideration, the legislature may agree with the majority that trial courts should serve a more active gatekeeping function to prevent juries from considering the defense in such cases.

Alternatively, were the policy issue raised in the proper forum, the legislature could decide to retain the view that prevailed when Connecticut first adopted the Model Penal Code in 1969; see Public Acts 1969, No. 828; which was the cultural high-water mark for psychological theories that could mitigate or even vitiate criminal culpability. See generally D. Denno, "Criminal Law in a Post-Freudian World," 2005 U. Ill. L. Rev. 601, 614–31. The Model Penal Code's provisions were heavily influenced by questions involving the impact of unconscious psychological processes on criminal culpability. See id.; see also id., 640–47. Indeed, Professor Herbert Wechsler, the principal architect of the Model Penal Code, explained that the extreme emotional disturbance defense, in particular, was designed "to give full scope to what amounts to a plea in mitigation based [on] a mental or emotional trauma of signifi-

State v. Henderson

cant dimensions, with the jury asked to show whatever empathy it can.'' H. Wechsler, ''Codification of Criminal Law in the United States: The Model Penal Code,'' 68 Colum. L. Rev. 1425, 1446 (1968). In adopting a version of the Model Penal Code, including the extreme emotional disturbance defense, Connecticut lawmakers were interested in using the ''enlighten[ed]'' ideas of the time to reform the state's approach to penological intervention. Report of the Commission To Revise the Criminal Statutes (1967) p. 2; see id. (''It has been said that the quality of a society is reflected in the way in which it deals with its offenders. Whom a society marks as an offender and how it treats him measures the society's degree of enlightenment and commitment to both order and liberty. A complete revision of Connecticut's criminal laws will serve to heighten that degree of enlightenment and [to] emphasize that commitment.'').

In this context, it is notable that the affirmative defense of extreme emotional disturbance, while no doubt potentially available to perpetrators of domestic violence, is also one of the few defenses available to *victims* of domestic violence who are driven to homicide under circumstances of extreme abuse. See, e.g., *Maddox* v. *Lord*, 818 F.2d 1058, 1059 (2d Cir. 1987) (defendant claimed that she shot and killed her estranged husband after his ''cruelty had pushed her to the perilous edge of sanity''). Ultimately, the question of whether a defendant meets the standard for an extreme emotional disturbance pursuant to § 53a-54a (a) is a paradigmatic question of fact for the jury. My view is simply that we must faithfully apply the proper standard of review and, in assessing whether the instruction should have been given to the jury, construe the evidence in the light most favorable to the defendant. To the extent that there are policy concerns regarding the affirmative defense itself, such considerations should properly be addressed to the legislature. See, e.g., *State*

State v. Henderson

v. *Joyner*, 225 Conn. 450, 460, 625 A.2d 791 (1993) ("the primary responsibility for enacting the laws that define and classify crimes is vested in the legislature"); see also *Commissioner of Mental Health & Addiction Services* v. *Freedom of Information Commission*, 347 Conn. 675, 693, 299 A.3d 197 (2023) ("courts may not overlook the text of a statute in order to advance unarticulated policy considerations, even if those policies are salutary and advisable").

In light of the foregoing, I would conclude that the evidence in the record, construed in the light most favorable to the defendant, would allow a rational juror to find by a preponderance of the evidence that the defendant committed the homicide under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse. The trial court therefore erred in failing to instruct the jury on that affirmative defense.

III

In the present case, I need not resolve whether the trial court's failure to provide a jury instruction for extreme emotional disturbance is an error of constitutional or nonconstitutional magnitude because, under any standard, the error was harmful.[13] The jury was

_____

[13] The matter is not squarely before us in this case and does not appear to be settled. We have said that an instructional error violates due process, and is of constitutional dimension, when it "confuse[s] the burden of proof, the presumption of innocence, or one of the essential elements of the crime." *State* v. *Adam P.*, 351 Conn. 213, 231, 330 A.3d 73 (2025). However, in *State* v. *Aviles*, supra, 277 Conn. 281, we said broadly that "jury instructions regarding the defense of extreme emotional disturbance are not of constitutional magnitude." Id., 310; see also *State* v. *Austin*, 244 Conn. 226, 244, 710 A.2d 732 (1998). This distinction often is important, of course, because it determines the standard used to decide whether a new trial is required. If an error is nonconstitutional, a new trial is proper only if "it is *reasonably probable* that the jury [was] misled," whereas, if an error is constitutional, a new trial is proper if "it is *reasonably possible* that the jury [was] misled." (Emphasis altered; internal quotation marks omitted.) *State* v. *Adam P.*, supra, 230. Additionally, if the denial of a jury instruction is not of constitutional magnitude, the defendant bears the burden of demonstrating harm,

State v. Henderson

deprived of the legal guidance necessary to assess whether the defendant was entitled to mitigation from murder to manslaughter under § 53a-54a (a). For all practical purposes, the court's failure to provide the instruction was fatal to the defendant's ability to prevail on his affirmative defense. See, e.g., *State* v. *Wilson*, 242 Conn. 605, 632, 700 A.2d 633 (1997) (failure to instruct jury on definition of "wrongfulness" with regard to defendant's appreciation of societal morals for purposes of legal insanity was harmful error because "the success of his defense *hinged* on whether the jury found that, at the time of the killing, he appreciated the *immorality* of his actions" (emphasis in original)); *State* v. *Casey*, 201 Conn. 174, 180, 513 A.2d 1183 (1986) (failure to instruct jury that extreme emotional disturbance need not follow "a provoking or triggering event" was fatal to defendant's ability to mount defense when his emotional disturbance purportedly arose over long period of time (internal quotation marks omitted)); cf. *State* v. *Baltas*, 311 Conn. 786, 822, 91 A.3d 384 (2014) (failure to instruct jury on certain witness' motive to testify falsely was harmful because that witness' "testimony and her credibility were critical to the defendant's convictions").

For the reasons enumerated in parts I and II of this opinion, I consider it reasonably possible that the jury could have concluded that the defendant was entitled to mitigation under § 53a-54a (a). To begin with, the defendant was required to prove his affirmative defense only by a preponderance of the evidence. See, e.g., *State* v. *Campbell*, supra, 328 Conn. 510. Moreover, the affirmative defense of extreme emotional disturbance does not require the jury to find that it was reasonable for the defendant to have killed the victim but, rather, that it was reasonable for the defendant to have suffered

whereas the state bears the burden of demonstrating harmlessness when the instructional error implicates constitutional rights. See id., 231.

an extreme emotional disturbance under the circumstances. See *State* v. *Parris*, supra, 352 Conn. 671–72 ("§ 53a-54a (a) requires that the jury determine whether the defendant acted under the influence of [an] extreme emotional disturbance and whether the disturbance itself, as opposed to the criminal act, had a reasonable explanation or excuse"). The jury could reasonably have credited the defendant's subjective account of his extreme emotional disturbance and concluded that there was an objectively reasonable explanation or excuse for the disturbance in light of his life circumstances and chronic drug addiction. I would therefore reverse the judgment of the trial court and remand the case for a new trial.

---